We'll move to our next case this morning, United States v. Johntavis Matlock. Ms. Christensen. Good morning, your honors. May it please the court, counsel. My name is Joanna Christensen. I represent the appellant, Johntavis Matlock. What we have in this case are two addicts. Two addicts who are friends, who use half a gram of heroin together and go on their separate ways. Mr. Matlock went into his home. Ms. Wiley drove home approximately 30 minutes, 24 minutes to her home. When she arrived home, her mother said she wasn't fully high. She went into her room where she was surrounded by other controlled substances. The government failed to prove beyond a reasonable doubt that Mr. Matlock's heroin was the but-for cause of Wiley's harm on December 11, 2020. The court should vacate the statutory enhancement, which would, of course, result in a full resentencing. The Supreme Court in Barrage, or Barrage, I'm unsure how to say that. I've heard different, has required the but-for causation. The harm must result from the defendant's drugs. It can't just contribute to, the drugs just can't contribute to the victim's harm. It has to be a resulting harm. The harm Wiley suffered on December 11 would have occurred absent Mr. Matlock's drugs. She had multiple suppliers, as was established in the record. But most importantly, she was surrounded in her room with six different types of controlled substances. Four of them marijuana or synthetic marijuana. One had black substances on it. She had a marijuana grinder in her hand when she was found. She had foil next to her when she was found. And there were also two bundles of heroin. She, the, part of the issue in this case is that neither Wiley nor any of these substances were tested by law enforcement. And there is reasonable doubt where this set of circumstances occurred. As I understand it, Ms. Christensen, there's no affirmative evidence of any other source of drugs that Wiley used that night, right? That night specifically, no. What we have is basically her interactions with Mr. Matlock on that day. Except for Mr. Britton. And I guess one of the things, I'd like you to focus if you could on the text that she sent, that Wiley sent to Matlock after she got back from the hospital. That I only did what she saw me do. In the trial, was there any hearsay objection? Was there any limiting instruction given about that text? No, not to my recollection. And I think that the argument was that that's what she texted. She also told the EMTs and the officers she hadn't used any. That she had done none that day. Well, we know that's not true. Right. I think addicts lie. I think that's a pretty reasonable understanding is that she would have told him, I only use what you use. Hey, be careful. I'm not sure she would have admitted that she used something else. Or if she would have remembered that she used something else. I think that she was inconsistent with her admissions, both to him. She also texted Joshua Britton at the same time, who she had been to his house. He testified she just got money from him. But I think that there is enough in here to have reasonable doubt regarding the substances that she used. And probably most importantly is this failure to investigate what else was around her. This court has found in other cases that when it's more than one potential source. Unfortunately, all three cases I cite to you are Anderson cases. Two of them are Monte Anderson. One is Turia Anderson. But the Monte Anderson, there were two separate sources of supply there. And he used both. And the court said that that was not enough to show for the enhancement. The other case is the Krieger case, of course, when there was a fentanyl patch. But also around the victim there were other controlled substances. There was a syringe. And none of that had been tested. We're certainly not arguing, as the government says, that you can't obtain a conviction or results from unless you have toxicology testing. That's not what we're arguing. But in this case, when there is a plethora of drugs around someone when she overdoses, it's a necessary step to go beyond a reasonable doubt. Should we give any significance at all to the marijuana evidence here? Well, I think some. I think more significant are the two other bundles of heroin that the officer identified on the body cam. Because she was revived by Narcan, it was clearly an opioid-related overdose. It wouldn't be. I mean, she wouldn't have been revived if it had been something else. The concern about the marijuana is that some of the marijuana had a black substance on it. And as I cited in my brief, marijuana can be tainted. There was testimony that they hadn't seen that in the Kentucky county where this was investigated. But it is a possibility. The other concern about the marijuana is the synthetic marijuana, which is often, as this court is probably aware, tainted. Often contains items that have nothing to do with marijuana at all. So I think that the two bundles of heroin are probably the most significant. The marijuana has less significance. The gabapentin is also a significant factor. Well, on that point, that's a prescription drug for her, right? Yes, yes. And at least as I understand the law, please tell me if you disagree, but if somebody takes an illegal opiate and that winds up having some kind of interaction with prescription or other drugs, that still permits the inference of causation from the illegal drug. I mean, her prescription drugs weren't killing her. Well, it probably depends on how much she took, honestly. But we don't know. Yes, if it had been just Mr. Matlock's heroin and the gabapentin, then that's essentially the contributing factor. But it's the results from it. It's not just a contributing factor. But when we have all the other evidence, I think gabapentin, again, on my hierarchy, is fairly low, although it can interact. Depends on how much. You know, if she would have overdosed just on Mr. Matlock's, then the gabapentin doesn't matter. But if Mr. Matlock's heroin was just a contributing factor to her overdose, that's not enough in the Supreme Court jurisprudence on the issue. Because we're here on this Rule 29 motion for judgment of acquittal, I'm somewhat concerned, going back to Judge Hamilton's first question, if the text messages get in. If they get in? Yeah. Once the text messages are in, where the statements in particular don't overdo it. Text message from her saying, I only use what you saw me use. And then him encouraging her, hey, then this stuff might not be. That line of text messages, looking at it from a point of, is there enough? That but for whatever Mr. Matlock provided on that date, she would not have overdosed. It just becomes somewhat unbalanced when you have the text messages. Alongside, of course, as you mentioned, the other drugs that were present. I think the text messages only get us so far. And it's because she was inconsistent. He also, you know, in general, they were friends. They knew each other. They used together. So when he says, this stuff's not for you, it doesn't necessarily mean the stuff we used. I think in general, because then they go on to talk about how in 2021 it's going to be our year. We're going to stop using. And I think that when she's telling him I just did this, he doesn't know about everything else. And he's like, you know, you have to be careful. And I think that goes more to the proof that he distributed to her, of course, which we've admitted. But not necessarily the proof that that caused her harm. So I see that I'm in my rebuttal time. I did want to address very quickly the sentencing. If this court finds that B1C does not apply, then resentencing has to occur regardless of whether Mr. Matlock raised that issue. Thank you. Thank you. Mr. Oliver. Good morning, Your Honors. May it please the Court. Jordan Oliver here on behalf of the United States. We are asking that you affirm Mr. Matlock's conviction because the evidence presented during the five-day trial that included over 150 exhibits and 20 witnesses was sufficient to convict him, which is the sole issue in this appeal. Because Mr. Matlock admitted to distributing heroin to Ms. Wiley about an hour before her overdose, opposing counsel's challenges to the evidence, I would say, fall primarily into two buckets. First, the bucket relating to evidence supporting that heroin caused the overdose, and two, evidence showing that that heroin came from Mr. Matlock. So I want to address both of those briefly. So for the first bucket, as you just heard, opposing counsel says that the evidence was insufficient for causation given that there were prescription pill bottles and other substances found in the room. I do want to note that none of the substances in there were tested, so I do think it's an inaccurate representation to say that they were bundles of heroin. There was one officer on a body cam footage that noted that he thought that it was heroin, but again, none of those substances were tested, and the defense did not call him as a witness, and neither did the government. I also want to note that it's the government's position that any testing would have been unnecessary given numerous factors here. The victim's response to Narcan, since the jury heard that Narcan only reverses opioid overdoses. The victim's statements to both first responders and hospital staff. Both members testified that she said that she used heroin prior to her overdose. And third, expert testimony on the timing and potency of heroin-fentanyl mixtures, which was consistent with the timing of Ms. Wiley's overdose about an hour after she ingested heroin with Mr. Matlock. Nor would the testing have shown us where the heroin came from, which brings us to that second bucket of evidence. Matlock speculates that because addicts typically have more than one source of supply, that the heroin that Ms. Wiley overdosed on could have come from anywhere. But there was no evidence at trial that Ms. Wiley obtained heroin from anybody else that day other than Mr. Matlock. And in reviewing her phone, law enforcement found no messages with anybody else about controlled substances other than Matlock. In fact, as Judge Pryor pointed out, there was those text messages leading up to that transaction, which required Ms. Wiley to drive across state lines to Mr. Matlock's residence in Evansville, Indiana, to obtain the heroin. From start to finish, that transaction took almost two hours, which supports a reasonable inference by the jury that Ms. Wiley wouldn't have taken such drastic measures to obtain heroin from Mr. Matlock if she already had it in her office. And the historical cell data also showed that after she ingested the heroin with Mr. Matlock, she drove directly back to her house in Kentucky. After Wiley recovered that evening, as Your Honors aptly pointed out, the first person that she texted when she was recovered at the hospital was no one other than Mr. Matlock, saying that she overdosed and told him to be careful. Notably, Mr. Matlock did not deny supplying her with heroin, and he also didn't suggest that she obtained it from any other source. Instead, he expressed concern and said he didn't want that to be on his conscience. Do we have any evidence, Mr. Oliver, from experts about dosages or time responses to different dosages and so on, or are we just kind of at sea here? Your Honor, I don't believe that there was testimony regarding the dosages, but there was testimony regarding the responses. Forensic pathologists and toxicologists both testified that the maximum impact of fentanyl can take some minutes to about an hour. Well, is the theory that this was fentanyl contaminated? That's correct, Your Honor. But we don't have that tested, so, okay. I guess I'm trying to, I was ideally hoping there might be evidence. Point two-tenths of a gram of heroin shared between two people, which was, I think, Matlock's testimony. Is that enough for this kind of a response? Does it necessarily tell us either he's wrong or it wasn't pure heroin or what? And I gather the record leaves us kind of at sea. I think so, Your Honor. But I think that this court's decision in United States v. Hardin, which I know you and Chief Judge Sykes are both intimately familiar with having served on the panel in that case. We've been on a lot of panels.  But just to touch base on the facts in that case, the defendant distributed heroin to middleman A, middleman A then distributed heroin to middleman B, and middleman B then distributed heroin to the victim. Later, or the next morning, that victim was found dead in his bedroom. And this court held that the evidence was still sufficient in that case. Despite conflicting testimony about what you just touched on, Judge Hamilton, regarding dosage, lack of dosage testimony, there was conflicting testimony about whether, you know, the timing of those distributions between middlemen. Here, I think we have a much tighter timeline. We have a defendant that admitted to distributing heroin directly to the victim. And so I think that the holding, this court's holding in Hardin supports what the government's asking for in this case. In your brief, Mr. Oliver, the government argues that, in essence, we should rely on evidence from Ms. Wiley's fatal overdose two or three months later to help uphold this conviction on the serious injury result. And I have trouble following that logic. What does that look like in detail? Well, Your Honor, I think the jury was free to consider all evidence they heard during the trial, and it wasn't like the government announced at the beginning of any witness' testimony. Well, you were pursuing the other claim, and that was where most of the evidence was, and the jury acquitted on that, right? That's correct, Your Honor. But I guess my point is that we didn't announce at the beginning of any witness' testimony that this only pertains to count one or count two. Right. And so I think the jury was free to consider that, especially with regard to the pattern of distribution testimony that further supported the jury's inference that Mr. Matlock was Ms. Wiley's supplier. Well, yeah, but given, I mean, there's no dispute about that, right? Matlock admitted as much with respect to the December incident. So I don't know what the February evidence gets you. I think it just helps support the inference, Your Honor, that this argument that there was potentially additional heroin in a room that came from some anonymous source of supply, I think that that evidence, although I agree that the text messages and his admissions are the stronger evidence, I think it – Without the text messages, I think you've got a much tougher case. But can I ask just one other feature of this case that struck me as very unusual is we've got a user, an addict, with unused controlled substances in her room. We don't usually see that with people who are users, do we? I think – I guess you say we don't know what it was, but – That's correct, because I believe the testimony at trial, Your Honor, was only that it was believed to be largely marijuana. Right. And that there was this foil that was next to her. But I don't believe that there was any testimony that there was actually other heroin in the room. There was just unknown substances found in the room. And there's only a passage of 15 or 20 minutes after she returned home. I'm sorry, Your Honor? It was only about 15 or 20 minutes after she returned home that she started experiencing OD symptoms, right? Her mom found her. That's correct, Your Honor. And I think that was still consistent with the expert testimony regarding the timing of that impact of the heroin she adjusted with Mr. Matlock about an hour earlier. So, again, I think that this court's decision in Harden supports what the government's asking for today. To the contrary, I think that what Mr. – if the court were to adopt what Mr. Matlock is asking today, I think it would be setting a dangerous precedent, holding that – essentially that the government would have to disprove every other potential cause of the overdose or every other potential supplier rather than proving Mr. Matlock's guilt beyond a reasonable doubt. That's not the law, and that's not the standard that the jury was held to in this case. I think it's also important to note that the jury did not just act as a rubber stamp in this case. I think that they – the fact that they acquitted on count two shows that they assessed this carefully, and they considered the evidence before them. And so, again, I think that that shows that the jury carefully considered all the evidence before them. So I think that the – again, the victim's response to the Narcan, her statements to both first responders and hospital staff, and the historical cell location data show that heroin was the cause of – or an expert testimony was the cause of the overdose. And the defendant's statements, his text messages with the victim, and the historical cell location data show that all point to Mr. Matlock as a source of supply. And so, unless your honors have any further questions, the government would respectfully request that this court affirm the jury's verdict and uphold the conviction. Thank you. Ms. Christensen, you can have some extra time. You used almost all your time. It's always a dangerous offer. I think first about the bundles of what I'm calling heroin. Officers know what heroin looks like. I put pictures in my brief, and I think that those of us in this room who are involved in these kind of cases know what heroin looks like. It's certainly not marijuana. I'll tell you that much. I will also note that Wiley left her home in the afternoon and was in Henderson, Kentucky at 4.47 p.m. It's a significant amount of time before she's at Mr. Matlock's home at 7 using WIC HEN. Then it takes her about half an hour to get home. I place that at about 7.40. Her mother doesn't call her – her mother doesn't tell her brother to call until 8.27. So it's a little bit more extended period of time than the government would have you believe. If it wasn't heroin, I guess it's hard to know if it's not tested. They can say it's not heroin, but it wasn't tested. And if they're going to rely on an investigation that doesn't test and thoroughly investigate all the possibilities, they don't have to disprove everything. But they do have to prove that her bodily harm resulted from Mr. Matlock's heroin use with her. Unless the court has further questions, I ask you to reverse and remain. Thank you. Our thanks to both counsel. We'll take the case under advisement.